UNITED STATES, Appellee

v.

Richard L. EASTON, First Lieutenant
U.S. Army, Appellant

No. 12-0053

Crim. App. No. 20080640

United States Court of Appeals for the Armed Forces

Argued March 12, 2012

Decided June 4, 2012

BAKER, C.J., delivered the opinion of the Court, in which STUCKY and RYAN, JJ., and COX, S.J., joined. ERDMANN, J., filed a separate opinion dissenting in part and concurring in part.

Counsel

For Appellant: Captain Meghan M. Poirier (argued); Colonel Patricia A. Ham, Lieutenant Colonel Imogene M. Jamison, Major Richard E. Gorini, and Captain E. P. Gilman (on brief).

For Appellee: Captain Bradley M. Endicott (argued); Major Ellen S. Jennings, Major Amber J. Roach, and Major LaJohnne A. White (on brief).


Military Judges: Theresa A. Gallagher and James L. Pohl


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Chief Judge BAKER delivered the opinion of the Court.

A military judge sitting as a general court-martial at Fort Stewart, Georgia, convicted Appellant, contrary to his pleas, of two specifications of missing movement by design, in violation of Article 87, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 887 (2006). Appellant was sentenced to dismissal and eighteen months of confinement. The convening authority reduced Appellant's term of confinement to ten months, waived the automatic forfeiture of all pay and allowances for a period of six months, and otherwise approved the adjudged sentence.

On review, the United States Army Court of Criminal Appeals (CCA) affirmed Appellant's conviction and sentence. United States v. Easton, 70 M.J. 507 (A. Ct. Crim. App. 2011).

We granted review of the following assigned issue:

> WHETHER THE ARMY COURT ERRED IN HOLDING THE
> APPELLANT'S TRIAL DID NOT VIOLATE HIS CONSTITUTIONAL
> RIGHT AGAINST DOUBLE JEOPARDY BECAUSE JEOPARDY DID NOT
> ATTACH AND EVEN IF IT DID, MANIFEST NECESSITY
> JUSTIFIED THE CONVENING AUTHORITY'S DECISION TO
> WITHDRAW CHARGES.

For the reasons set forth below, we conclude that the CCA erred when it held that the convening authority's decision to withdraw charges was justified by manifest necessity. The Government failed to meet the high standard required for manifest necessity: trial counsel knew that the video tapes were unusable but still proceeded to trial; and there is no

2

indication in the record that the convening authority withdrew the charges based on manifest necessity.

Having found that there was no manifest necessity to withdraw the charges, we must address the constitutionality of Article 44(c), UCMJ, 10 U.S. § 844(c) (2006).  We hold that, in regards to members trials, Article 44(c), UCMJ, is constitutional on its face and as applied to Appellant.  While the protection against double jeopardy under the Fifth Amendment applies in the military context, see Wade v. Hunter, 336 U.S. 684, 690 (1949), this does not answer the separate question as to when double jeopardy attaches.  That question is answered by Article 44, UCMJ:  it attaches "after the introduction of evidence."  While we recognize that this is different than the Supreme Court's holding as to when double jeopardy attaches in the civilian world, see Crist v. Bretz, 437 U.S. 28, 35 (1978) ("[J]eopardy attaches when the jury is empaneled and sworn."), in the military context, the accused does not have the same protected interest in retaining the panel of his choosing, and therefore jeopardy does not attach in a court-martial until evidence is introduced.  The structure and purpose of the UCMJ and the Manual for Courts-Martial (MCM) also indicate a different intent on the part of Congress and the President, respectively.  The decision of the CCA is affirmed.

3

I.   BACKGROUND

A.  Facts

At the time of his court-martial, Appellant was assigned as a physician's assistant in the Third Infantry Division based at Fort Stewart, Georgia.  He had served about fifteen years on active duty in the Army as an enlisted member and as a commissioned officer.

In March 2007, Appellant's unit deployed to Iraq as part of the "surge" of forces authorized by the President.[1]  Appellant

---

[1] On January 10, 2007, the President delivered a speech to the nation describing the need for a surge of forces in Iraq:

> The violence in Iraq, particularly in Baghdad,
> overwhelmed the political gains the Iraqis had made.
> Al Qaeda terrorists and Sunni insurgents recognized
> the mortal danger that Iraq's elections posed for
> their cause.  And they responded with outrageous acts
> of murder aimed at innocent Iraqis.
>
> . . . .
>
> On September the 11th, 2001, we saw what a refuge for
> extremists on the other side of the world could bring
> to the streets of our own cities.  For the safety of
> our people, America must succeed in Iraq.
>
> . . . .
>
> Our past efforts to secure Baghdad failed for two
> principal reasons:  There were not enough Iraqi and
> American troops to secure neighborhoods that had been
> cleared of terrorists and insurgents, and there were
> too many restrictions on the troops we did have
>
> . . . .

was charged with intentionally missing the flight with his unit to Iraq.  After missing the initial flight, he was ordered to leave on a flight departing the next day.  Appellant also missed that flight by design.

The following month, Appellant was charged with two specifications of missing movement.  On June 29, 2007, prior to trial, the military judge ruled that two Government witnesses, Lieutenant Colonel O., Battalion Commander of the Division Special Troops Battalion, and Major E., a physician's assistant, were unavailable because of their deployment to Iraq and ordered that they be deposed by videotape.  The depositions were conducted in Iraq and the tapes returned to the United States.

On July 16, 2007, the court met, and the military judge noted that:

> during the recess counsel for both sides reviewed a videotaped deposition.  Both counsel agreed that the tape was useless, that there was no visual image on the videotape and that the audio was incomprehensible. The government stated that they still desired to proceed to trial on Thursday, 19 July 2007.[2]

---

So I've committed more than 20,000 additional American troops to Iraq.

Address to the Nation on the State of the War in Iraq by President George W. Bush, 1 Pub. Papers 16-17 (Jan. 10, 2007).

[2] This quote is from the transcript, which is available in summarized form only.

On the same day, voir dire was conducted and a panel of members sworn and assembled. On July 18, 2007, the day opening statements and introduction of evidence were to begin, the convening authority withdrew and dismissed the charges and specifications without prejudice. No reason for the dismissal was given at trial and the convening authority's memorandum does not provide an explanation. The parties agree on this fact, but not on its significance.

In May 2008, the convening authority re-referred the two specifications for missing movement. At trial, Appellant moved to dismiss the charges arguing that constitutional double jeopardy applied and that the convening authority had improperly withdrawn the charges. The military judge denied the motions. Subsequently, Appellant was found guilty of two specifications of missing movement in a judge-alone trial.

B. CCA Decision

On appeal to the CCA, Appellant renewed his argument that his second trial violated the prohibition against double jeopardy and that Article 44(c), UCMJ, is unconstitutional as applied to him. In its opinion, the CCA declined to rule on the constitutionality of Article 44(c), UCMJ. Easton, 70 M.J. at 511. It held that, regardless of whether jeopardy attached at the first court-martial, "jeopardy did not terminate" because there was a "manifest necessity" for a new trial. Id. The

court also explained that, although trial counsel failed to secure depositions of the unavailable witnesses, the charges were not withdrawn by the convening authority for an improper purpose as prohibited by Rule for Courts-Martial (R.C.M.) 604.[3] Id. at 513.

## II.  DISCUSSION

"The constitutionality of a statute is a question of law we review de novo."  United States v. Medina, 69 M.J. 462, 464 (C.A.A.F. 2011).  We review a military judge's findings of fact under a clearly erroneous standard.  United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995).

The Fifth Amendment provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of

---

[3]

(a) Withdrawal.  The convening authority . . . may for any reason cause any charges or specifications to be withdrawn from a court-martial at any time before findings are announced.

(b) Referral of withdrawn charges.  Charges which have been withdrawn from a court-martial may be referred to another court-martial unless the withdrawal was for an improper reason.  Charges withdrawn after the introduction of evidence on the general issue of guilt may be referred to another court-martial only if the withdrawal was necessitated by urgent and unforeseen military necessity.

R.C.M. 604.  "Improper reasons for withdrawal include an intent to interfere with the free exercise by the accused of constitutional or codal rights, or with the impartiality of a court-martial."  R.C.M. 604 Discussion.

life or limb." U.S. Const. amend. V, cl. 2. The Double Jeopardy Clause was designed:

> to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . . The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Serfass v. United States, 420 U.S. 377, 387-88 (1975) (omissions in original) (quoting Green v. United States, 355 U.S. 184, 187-88 (1957)).

The Supreme Court has made clear that "jeopardy does not attach, and the constitutional prohibition can have no application, until a defendant is 'put to trial before the trier of facts, whether the trier be a jury or a judge.'" Id. at 388 (quoting United States v. Jorn, 400 U.S. 470, 479 (1971)). For a civilian nonjury trial, jeopardy attaches when a court begins to hear evidence. Id. In a civilian jury trial, jeopardy attaches when a jury is empaneled and sworn. Crist, 437 U.S. at 35. In holding that this constitutional rule applies not only to federal jurisdictions but also to the states, the Supreme Court has stated that this rule is designed "to protect the interest of an accused in retaining a chosen jury." Id.

8

United States v. Easton, No. 12-0053/AR

In contrast, the UCMJ states that jeopardy attaches when evidence is introduced. Article 44, UCMJ, provides:

> (a)  No person may, without his consent, be tried a second time for the same offense.
>
> . . . .
>
> (c)  A proceeding which, after the introduction of evidence but before a finding, is dismissed or terminated by the convening authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused is a trial in the sense of this article.

This is true whether the court-martial is before members or by military judge alone. The point at which jeopardy attaches under the UCMJ thus "does not conform precisely to the Supreme Court's decisions that jeopardy attaches in a jury trial when the jury is sworn, even though no evidence has been presented." United States v. Cook, 12 M.J. 448, 452-53 (C.M.A. 1982).[4]

In both the military and civilian contexts, once jeopardy has attached, an accused may not be retried for the same offense without consent once jeopardy has terminated.[5] Richardson v.

---

[4] However, Cook did not decide the constitutional issue because the facts fell "outside the purview of either the Fifth Amendment or Article 44(a)" since the accused had elected to be tried by military judge alone and no evidence had been introduced. Id. at 453.

[5] One scholar explained the meaning of "twice in jeopardy" as follows:

> Although courts often speak of when jeopardy attaches, this attachment metaphor misleads to the extent that it implies that there is one key moment

United States v. Easton, No. 12-0053/AR

United States, 468 U.S. 317, 325 (1984).  Once double jeopardy

has attached, it precludes retrial under a variety of scenarios

including an acquittal, discharge of the jury in the absence of

manifest necessity, or dismissal of the charges in the absence

of manifest necessity.  It does not preclude subsequent

proceedings, inter alia, where there is "manifest necessity" for

declaring a mistrial or otherwise discharging the jury.  United

States v. Perez, 22 U.S. 579, 580 (1824).

> "Manifest necessity" should not be applied:
>
> mechanically or without attention to the particular
> problem confronting the trial judge.  Indeed, it is
> manifest that the key word "necessity" cannot be
> interpreted literally; instead, contrary to the
> teaching of Webster, we assume that there are degrees
> of necessity and we require a "high degree" before
> concluding that a mistrial is appropriate.

Arizona v. Washington, 434 U.S. 497, 506 (1978) (footnotes

omitted); see also Burtt v. Schick, 23 M.J. 140, 142 (C.M.A.

1986) (citing Arizona, 434 U.S. at 505) ("When trial is

terminated over defense objection . . . the Government has a

---

> rather than two.  Jeopardy is a process -- like any
> other game -- and we thus must ask when it begins and
> when it ends.
>
> . . . .
>
> The Double Jeopardy Clause in effect says that for any
> given offense, the government may play the
> adjudication game only once:  No person shall be
> "twice put in jeopardy."

Akhil Reed Amar, Essay, Double Jeopardy Law Made Simple, 106
Yale L.J. 1807, 1838-40 (1997).

10

heavy burden of showing 'manifest necessity' for the mistrial in order to remove the double-jeopardy bar to a second trial."). There are two issues before this Court. First, was the withdrawal of charges in July 2007 the product of manifest necessity? Second, if not, is Article 44(c), UCMJ, constitutional?

A. "Manifest Necessity" Requirement

We first address the CCA's conclusion that the convening authority's decision to withdraw charges was justified by "manifest necessity." The CCA explained that "manifest necessity" existed to withdraw the charges since it is "implicit" that "operational considerations drove the convening authority's decision to terminate appellant's first court-martial," and there is "no evidence" that the convening authority withdrew the charges in bad faith. Thus, "[a]bsent evidence of bad faith," the CCA "will not second-guess the convening authority's tactical decision to withdraw charges here." Easton, 70 M.J. at 513.

As noted above, a "high" degree of necessity is required to meet the manifest necessity standard. Arizona, 434 U.S. at 506. "The discretion to discharge the jury before it has reached a verdict is to be exercised 'only in very extraordinary and striking circumstances.'" Downum v. United States, 372 U.S. 734, 736 (1963). "The power ought to be used with the greatest

caution, under urgent circumstances, and for very plain and obvious causes." Perez, 22 U.S. at 580.

The Supreme Court has addressed "manifest necessity" in the military context on one occasion. In Wade v. Hunter, decided by the Supreme Court in 1949 under the Articles of War and before the enactment of the UCMJ,[6] the accused and another soldier were accused of raping two German women during the Allied advance through Germany. 336 U.S. 684, 686 (1949). The initial court-martial was convened and took testimony but was continued because two witnesses were sick. Id. at 686-87. A week later, the convening authority dissolved the court-martial before it could make a decision because, "'[d]ue to the tactical situation the distance to the residence of such witnesses has become so great that the case cannot be completed within a reasonable time.'" Id.

The Court held on these facts that the Fifth Amendment did not bar the accused's second trial. An initial trial may be discontinued for "manifest necessity" or where failing to discontinue "would defeat the ends of justice," and the record demonstrated that "the tactical situation brought about by a rapidly advancing army was responsible for withdrawal of the

---

[6] Act of June 4, 1920, 41 Stat. 759 (repealed 1950). The Continental Congress enacted the Articles of War in 1775. They were subsequently substantially revised several times. United States v. Howe, 17 C.M.A. 165, 170-71, 37 C.M.R. 429, 434-35 (1967).

charges from the first court-martial." Id. at 690-91. The evidence at hand, which must be viewed taking "all the circumstances into account," was "enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." Id. at 689-91.

In Downum, the Supreme Court expounded on the manifest necessity standard, holding that a defendant's trial by a second jury violated the prohibition against double jeopardy where the first jury had been sworn and discharged because a prosecution witness had not been served with a summons and because no other arrangements had been made to assure the witness's presence. 372 U.S. at 734-35. Specifically:

> [t]he day before the case was first called, the prosecutor's assistant checked with the marshal and learned that [the witness's] wife was going to let him know where her husband was, if she could find out. No word was received from her and no follow-up was made. The prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found.

Id. at 735.

The Court held that the second trial violated the prohibition against double jeopardy, though it rejected the contention that "the absence of witnesses 'can never justify

13

discontinuance of a trial'" and agreed with the conclusion in Wade that "[e]ach case must turn on its facts." Id. at 737.

The Government argues this case is governed by Wade. In Wade, the witnesses suddenly became unavailable due to operational necessity. The facts here are distinguishable. In this case it was long known that the witnesses would be unavailable and provision was made for their absence. The military judge accounted for the witnesses' unavailability -- unlike in Wade -- when he ordered their depositions taken. In the end, the absence of testimonial evidence from Lieutenant Colonel O. and Major E. was caused by a technical failure that rendered the tapes unusable. Put simply, the Government was responsible for taking and providing the depositions, and it failed to successfully complete this task. Failing to provide operable video tapes is not a military exigency. Even if military necessity required the taking of depositions in Iraq, it did not compel the transport of the tapes back to the United States in unusable condition. Moreover, the prosecution allowed the members to be sworn and empaneled, informing the military judge that "they still desired to proceed to trial on Thursday, 19 July 2007," even though "[b]oth counsel agreed that the tape was useless." Thus, as in Downum, "[t]he situation presented is

14

simply one where the [prosecution] entered upon the trial of the case without sufficient evidence to convict."[7]  372 U.S. at 737.

Finally, there is no indication as to why the convening authority withdrew the charges, and thus no evidence that the charges were withdrawn on account of manifest necessity.  The CCA assumed that the charges were withdrawn because of the faulty video tapes, but the convening authority did not explain why the charges were withdrawn.  He merely stated that the charge "is hereby withdrawn and . . . is dismissed without prejudice."  Indeed, at the accused's second trial, trial counsel stated that the Government had no direct evidence why charges were withdrawn in July 2007.  Thus, unlike in Wade, the convening authority did not explain why charges were withdrawn, and thus we cannot come to any conclusion as to the presence or absence of manifest necessity based on the convening authority's actions.

This conclusion is buttressed by the fact that the military judge neither addressed manifest necessity nor made it the basis for his ruling.  The military judge merely concluded that withdrawal and dismissal were proper, explaining "that the dismissal was for a proper purpose" and that "the unavailability

---

[7] This behavior also implicates concerns echoed in Downum, 372 U.S. at 736, about the prosecutor's (or convening authority's) power to withdraw charges mid-trial based on an assessment of the strength of the Government's case.

of essential witnesses to the case and also the unavailability of the alternate means and the unwillingness of the trial judge at the time to grant a continuance."

With this background in mind, the Government has not demonstrated that the withdrawal of charges in July 2007 was the result of manifest necessity. The standard for manifest necessity is high, and the Government has not met that standard.

B. Constitutionality of Article 44(c), UCMJ

Having determined that there was no manifest necessity to withdraw the charges, we must now address Appellant's argument that Article 44(c), UCMJ, is unconstitutional as applied to trials by court members.

"Constitutional rights identified by the Supreme Court generally apply to members of the military unless by text or scope they are plainly inapplicable." United States v. Marcum, 60 M.J. 198, 206 (C.A.A.F. 2004). In general, the Bill of Rights applies to members of the military absent a specific exemption or "certain overriding demands of discipline and duty." Courtney v. Williams, 1 M.J. 267, 270 (C.M.A. 1976) (quoting Burns v. Wilson, 346 U.S. 137, 140 (1953)). Though we have "consistently applied the Bill of Rights to members of the Armed Forces, except in cases where the express terms of the Constitution make such application inapposite . . . . these constitutional rights may apply differently to members of the

armed forces than they do to civilians." Marcum, 60 M.J. at 205 (citation omitted). "[T]he burden of showing that military conditions require a different rule than that prevailing in the civilian community is upon the party arguing for a different rule." Courtney, 1 M.J. at 270.

Applying this framework, we first note that there is no dispute that the protection against double jeopardy applies in courts-martial. Furthermore, in courts-martial, there is no right to indictment by grand jury. U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . . . ."). In addition, there is no Sixth Amendment right to trial by jury in courts-martial. Ex parte Quirin, 317 U.S. 1, 39 (1942); United States v. Wiesen, 57 M.J. 48, 50 (C.A.A.F. 2002) (per curiam).

The constitutional question here relates to the timing of when jeopardy attaches in the military context. This is an issue addressed by case law, the UCMJ, and the R.C.M., not the text of the Constitution.

The lead case in this area is Crist v. Bretz, where the Supreme Court held that jeopardy attaches when a jury is empaneled and sworn in both federal and state jury trials. 437

17

U.S. at 36. Crist does not, however, address double jeopardy in a military context. Indeed, "[t]he reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury." Id. at 35. The Sixth Amendment right to a jury trial does not apply to courts-martial and, therefore, protecting the interest of an accused in retaining a chosen military "jury" does not directly apply.

Against this backdrop we consider Congress's exercise of its authority reflected in the UCMJ to make rules and regulations of the land and naval forces. Article 44 was enacted in 1950 as part of the UCMJ.[8] The structure and purpose of the UCMJ suggest a different purpose and legislative intent. In fact the application of the Crist rule to courts-martial would negate portions of the UCMJ. For example, the text of Article 29, UCMJ, 10 U.S.C. § 829 (2006), is clearly at odds with the rationale in Crist. Under Article 29, UCMJ, members may be excused by the military judge "for physical disability or other good cause" or by the convening authority for "good

---

[8] Article 44, UCMJ, represented "a substantial strengthening of the rights of an accused." It "forbids a rehearing where the prosecution failed to make even a prima facie case" and "prevents the retrial of a case which is terminated by the prosecution for failure of available evidence or witnesses." S. Rep. No. 81-486, at 20 (1950), reprinted in 1950 U.S.C.C.A.N. 2222, 2244 (1950).

cause."  "'Good cause' includes physical disability, military

exigency, and other extraordinary circumstances which render the

member . . . unable to proceed with the court-martial within a

reasonable time."[9]  R.C.M. 505(f).  Excused members need not be

replaced unless failing to do so would cause the number of

members to fall below quorum.  United States v. Colon, 6 M.J.

73, 74 (C.M.A. 1978).  And when a court-martial is reduced below

a specified number of members, the convening authority may

detail new members to proceed with the trial.  Article 29, UCMJ.

Article 29, UCMJ, illustrates that, due to the unique

nature of the military, an accused's chosen panel will not

necessarily remain intact throughout a trial.  By enacting

Article 29, UCMJ, as it did, Congress evinced the intent that,

in light of the nature of the military, an accused does not have

the same right to have a trial completed by a particular court

panel as a defendant in a civilian jury trial does.[10]

---

[9] "'Good cause' does not include temporary inconveniences which
are incident to normal conditions of military life."  R.C.M.
505(f).

[10] The federal rules provide for the replacement of jurors and
the defendant plays a part in the selection of those alternate
jurors.  See Fed. R. Crim. P. 24(c)(2)(A) ("Alternate jurors
must have the same qualifications and be selected and sworn in
the same manner as any other juror.").  Similarly, the military
accused has the right to voir dire new members detailed by the
convening authority.  However, unlike the civilian system, if
excusal of a court-martial member does not reduce the panel
below quorum, the accused is not entitled to an additional

Further, under Article 16, UCMJ, members may sit as a special court-martial consisting of not less than three members without a military judge, in which case they exercise all judicial functions. Article 16, UCMJ, 10 U.S.C. § 816 (2006); MCM, Analysis of the Rules for Courts-Martial app. 21 at A21-57 (2008 ed.). In this type of special court-martial, members must be sworn before the accused is even arraigned. See Article 42(a), UCMJ, 10 U.S.C. § 842 (2006). Such a panel could not properly function if jeopardy attached when members were sworn since they would not be able to perform any duties without jeopardy attaching.

Finally, the Crist rule would also negate application of certain rules established by the MCM, pursuant to the President's authority as Commander in Chief and as delegated by Congress pursuant to Article 36, UCMJ, 10 U.S.C. § 836 (2006). In particular, R.C.M. 604(b) -- which states, "Charges withdrawn after the introduction of evidence on the general issue of guilt may be referred to another court-martial only if the withdrawal was necessitated by urgent and unforeseen military necessity" -- would be negated by such application.

Thus, the question presented is not one of straight case law application. Rather it is one where Congress, and to a

---

member, notwithstanding that the composition of the panel has now changed. See Article 29(b),(c), UCMJ.

lesser extent the President, has exercised authority in a military context to specifically define the point at which jeopardy attaches. Whereas Supreme Court precedent, as reflected in Crist, is directed to civilian practice and in a manner that does not expressly address military context. Nor does the Supreme Court's reasoning neatly or clearly apply in military practice, where the UCMJ and the courts have long held that a servicemember does not have a right to a particular jury.

Were we to mechanically apply the holding in Crist to the military context, we would negate numerous portions of the UCMJ, including Article 29, Article 16, and other articles that specify how a special court-martial without a military judge operates.[11] See Articles 19, 26, 40, 41, 51, UCMJ, 10 U.S.C. §§ 819, 826, 840, 841, 851 (2006). That Congress was purposeful in selecting the point at which jeopardy attaches is illustrated not only with respect to Articles 29 and 16, UCMJ, -- which only function properly if the Article 44, UCMJ, standard for jeopardy

---

[11] When Article 44, UCMJ was adopted in 1950, most civilian jurisdictions had the rule that jeopardy attaches when the jury was sworn and empaneled. See, e.g., Cornero v. United States, 48 F.2d 69, 69 (9th Cir. 1931); United States v. Wells, 9 C.M.A. 509, 511, 26 C.M.R. 289, 291 (1958) ("Federal courts have held that jeopardy normally attaches [in a jury trial] . . . when the accused has been arraigned and has pleaded and the jury has been impanelled and sworn."); State v. Kiewel, 207 N.W. 646, 647 (Minn. 1926); Stough v. State, 128 P.2d 1028, 1032 (Okla. Crim. App. 1942); State v. Chandler, 274 P. 303, 304 (Or. 1929); State v. Brunn, 154 P.2d 826, 838 (Wash. 1945).

is applied -- but also because, despite the existence of the
Crist rule at the time, the 1983 redrafting of the UCMJ did not
amend the rule for double jeopardy.  Thus, we hold that Congress
appropriately exercised its Article I power -- which authorizes
it "[t]o make Rules for the Government and Regulation of the
land and naval Forces" -- when it enacted Article 44(c), UCMJ.[12]

Finally, additional and adequate safeguards exist to
protect an accused's right not to be tried without his consent a
second time for the same offense.  Under R.C.M. 604(b), if the
convening authority withdraws charges "for an improper reason,"
they cannot be re-referred for trial.  Charges withdrawn after
the introduction of evidence on the general issue of guilt may
be referred to another court-martial only if the withdrawal was
necessitated by urgent and unforeseen military necessity."

### III.  CONCLUSION

For the foregoing reasons, we hold that the CCA erred when
it found that the convening authority's decision to withdraw
charges was justified by manifest necessity.  However,
Appellant's trial did not violate his constitutional right
against double jeopardy because jeopardy had not previously

---

[12] We have long held that "'[j]udicial deference . . . is at its
apogee' when the authority of Congress to govern the land and
naval forces is challenged."  United States v. Weiss, 36 M.J.
224, 226 (C.M.A. 1992) (quoting Solorio v. United States, 483
U.S. 435, 447 (1987)).  This principle applies even when the
constitutional rights of a servicemember are implicated by a
statute enacted by Congress.  Solorio, 483 U.S. at 448.

attached.  The decision of the United States Army Court of

Criminal Appeals is affirmed.

United States v. Easton, No. 12-0053/AR

ERDMANN, Judge (dissenting in part and concurring in part):

I concur with the majority's conclusion that the Court of Criminal Appeals erred in holding that "manifest necessity" justified the convening authority's withdrawal of charges. I do not agree, however, with the majority's conclusion that Article 44(c), Uniform Code of Military Justice (UCMJ), was constitutionally applied in this case and therefore respectfully dissent from that portion of the opinion.[1]

As recognized by the majority, this court has long held that the Bill of Rights applies to servicemembers except for those that are "expressly or by necessary implication inapplicable." Courtney v. Williams, 1 M.J. 267, 270 (C.M.A. 1976) (quoting United States v. Jacoby, 11 C.M.A. 428, 430-31, 29 C.M.R. 244, 246-47 (1960)); United States v. Marcum, 60 M.J. 198, 206 (C.A.A.F. 2004). "Even though the Bill of Rights applies to persons in the military, 'the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty.'" Courtney, 1 M.J. at 270 (quoting Burns v. Wilson, 346 U.S. 137, 140 (1953)). Therefore when this court applies Supreme Court constitutional

---

[1] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Easton does not specifically argue that Article 44(c), UCMJ, is unconstitutional on its face. Therefore, I see no reason to address the statute's facial validity.

precedent, it does so while "specifically address[ing] contextual factors involving military life."  Marcum, 60 M.J. at 205.  A statutory or regulatory provision in the civilian community that is held to offend the Constitution may nevertheless withstand a constitutional challenge in the military if there exists overriding demands of discipline and duty that are either expressly stated or necessarily implied. See Id. at 206; Courtney, 1 M.J. at 270.

"[T]he burden of showing that military conditions require a different rule than that prevailing in the civilian community is upon the party arguing for a different rule."  Courtney, 1 M.J. at 270; see also Marcum, 60 M.J. at 205.  The Government recognized that Article 44(c) is contrary to the civilian rule articulated in Crist v. Bretz, 437 U.S. 28 (1978), and therefore has the burden of convincing this court that the UCMJ rule is necessary because of "certain overriding demands of discipline and duty."  See Courtney, 1 M.J. at 270 (quoting Burns, 346 U.S. at 140).

Neither a Military Accused's Chosen Panel Nor a Federal Criminal Defendant's Chosen Jury Will Necessarily Remain Intact Throughout Trial

The constitutional issue in this case is simply stated: whether the Supreme Court holding in Crist v. Bretz that jeopardy attaches when a jury is empaneled and sworn is applicable to military servicemembers being tried under the

2

UCMJ.  The majority finds the Crist decision to be inapplicable to military servicemembers noting that the reason for the Supreme Court's holding in Crist was to protect "the interest of an accused in retaining a chosen jury."  United States v. Easton, __ M.J. __ (18) (C.A.A.F. 2012) (quoting Crist, 437 U.S. at 35) (quotation marks omitted).  The majority notes that a military judge can excuse a panel member under the UCMJ "for physical disability or other good cause" and the convening authority can excuse a member for "good cause," and that excused members need not be replaced unless failing to replace them would lose the quorum.  Id. at __ (18-19).  As a result, the majority concludes that a military accused's chosen panel will not necessarily remain intact throughout a trial.  Id. at __ (19).  From this analysis the majority finds a congressional intent that a military accused would not have the same right to be tried by members of his choosing as does an accused in a civilian criminal trial and that the Crist rule is inapplicable in a military context.[2]  Id. at __ (18-19).

---

[2] I agree with the majority that "'[j]udicial deference . . . is at its apogee' when the authority of Congress to govern the land and naval forces is challenged."  United States v. Easton, __ M.J. __ (22) n.12 (C.A.A.F. 2012) (alterations in original) (citations omitted).  However, as broad as Congress's discretion may be, it is not "free to disregard the Constitution when it acts in the area of military affairs."  United States v. Graf, 35 M.J. 450, 461 (C.M.A. 1992) (quoting Rostker v. Goldberg, 453 U.S. 57, 67 (1981)).

United States v. Easton, No. 12-0053/AR

   This conclusion initially ignores the broad authority of a federal district judge to excuse jurors in a criminal case once a trial has commenced.[3]  Under Federal Rule of Criminal Procedure (Fed. R. Crim. P.) 24(c), if a juror is excused prior to the time a jury retires to consider a verdict, the juror may be replaced by an alternative juror.  However, Fed. R. Crim. P. 23(b)(3) provides that after the jury has retired to deliberate and the court finds it necessary to excuse a juror for good cause, the court may permit a jury of eleven persons to return a verdict.  In this regard, there appears to be little difference between the federal rule and UCMJ provisions.

   While a court-martial panel may lose more than one member and stay intact (until it falls below a quorum),[4] a federal criminal jury can lose a member and remain intact as well. However, in both systems an accused has the right to participate in the process of selecting original and replacement panel members or jurors.  Further, there is nothing in the Congressional Record that reflects any intent on the part of

---

[3] Reasons for excusing jurors in federal trials have included: illness, travel plans, family emergency, medical emergencies, emotional instability, and religious holidays.  See Murray v. Laborers Union Local No. 324, 55 F.3d 1445 (9th Cir. 1995); see also United States v. Longwell, 410 F. App'x 684 (4th Cir. 2011); United States v. McFarland, 34 F.3d 1508 (9th Cir. 1994); United States v. Huntress, 956 F.2d 1309 (5th Cir. 1992); United States v. Wilson, 894 F.2d 1245 (11th Cir. 1990); United States v. O'Brien, 898 F.2d 983 (5th Cir. 1990).
[4] Articles 25 and 29, UCMJ, 10 U.S.C. § 825, 829 (2006); Rule for Courts-Martial 903(a)(1).

Congress that an accused in the military would not have the same basic constitutional right to retain an original panel as a defendant in federal court has to retain an original jury.[5]

## Article 44(c) Was Not Enacted to Address the Demands of Discipline or Duty in the Military

When Article 44 was initially proposed it contained the language found in current subsections (a) and (b), but not the language found in subsection (c). Subsection (a) contains the traditional prohibition against being placed twice in jeopardy. Subsection (b) was added to address the concerns of Congress over the automatic appeal system of the UCMJ. See, e.g., H.R. Rep. No. 81-491, at 23 (1949); Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. on Armed Services, 81st Cong. 803 (1949) [House UCMJ Hearings] (statement by Colonel Frederick B. Wiener); Id. at 1048-49 (statement of Felix Larkin). At the time of the adoption of the UCMJ, the general belief was that the Double Jeopardy Clause of the Fifth Amendment allowed rehearings after an appellant successfully appealed a conviction only because in appealing the case, the appellant had waived his double jeopardy rights. See Green v. United States, 355 U.S. 184, 189 (1957). Article 44(b) was

---

[5] The majority's attempt in footnote 10 to bolster its interpretation of congressional intent by distinguishing between Fed. R. Crim. P. 24(c)(2)(A) and Article 29(b)-(c), UCMJ, is unavailing as it appears to overlook both the Fed. R. Crim. P. 23(b)(3) and the requirements of Articles 25, 41, and 42 as those articles would apply to additional members detailed to the panel when it drops below quorum.

United States v. Easton, No. 12-0053/AR

adopted to ensure that the Double Jeopardy Clause did not prevent a rehearing in a situation where an accused did not initiate the appeal. See S. Rep. No. 81-486, at 19-20 (1949); see also United States v. Ivory, 9 C.M.A. 516, 519-20, 26 C.M.R. 296, 299-300 (1958).

Article 44(c), however, was not a part of the originally proposed UCMJ and was adopted during the congressional hearings in response to the Supreme Court decision in Wade v. Hunter, 336 U.S. 684 (1949).[6] House UCMJ Hearings, at 1047-48 (1949) (statement of Felix Larkin). Wade was a member of the 76th Infantry Division during World War II and had been charged with a rape that occurred in Germany. Wade, 336 U.S. at 685-86. A general court-martial was convened, evidence taken, and the court then closed for deliberation. Id. at 686. Before reaching a decision, however, the military judge announced that the court-martial would be continued in order to secure the testimony of two additional witnesses. Id. at 686. The convening authority later withdrew the charges and transferred the case to another convening authority as the 76th Division was advancing into Germany and was no longer in the area where the witnesses resided. Id. at 686-87. The charges were later re-referred by a new convening authority and Wade moved to dismiss on the basis of double jeopardy. Id. at 687. The military

---

[6] Wade v. Hunter is also significant as it clarified that the Fifth Amendment applied to courts-martial. Id. at 690.

6

judge denied the motion and Wade was convicted. Id. The case eventually made it to the Supreme Court which ruled that double jeopardy did not bar the second trial because the first trial was terminated due to "manifest necessity." Id. at 688, 690.

Following the Wade decision there was concern that the proposed Article 44 would continue to allow the convening authority to terminate an ongoing trial because the government was not fully prepared. Uniform Code of Military Justice: Hearings on S. 857 and H.R. 4080 Before a Subcomm. of the S. Comm. on Armed Services, 81st Cong. 167-70 (1949) [Senate UCMJ Hearings] (statement of Gen. Franklin Riter). The congressional response to this concern was the adoption of Article 44(c), which was designed to prevent a second prosecution where a court-martial had been convened and evidence had been received, but is later terminated because the government was not fully prepared. House UCMJ Hearings, at 671 (statement of Gen. Franklin Riter); Senate UCMJ Hearings, at 170 (statement of Gen. Franklin Riter).[7]

The importance of this history is that the language of Article 44(c) was adopted not because of any overriding demand for discipline or duty in the military, but rather to protect servicemembers from retrial where the prosecution initiated a

---

[7] For an excellent discussion of double jeopardy issues in the military justice system, see Daniel J. Everett, Double, Double Toil and Trouble: An Invitation for Regaining Double Jeopardy Symmetry in Courts-Martial, Army Lawyer, Apr. 2011, at 6.

United States v. Easton, No. 12-0053/AR

trial only to have the convening authority withdraw the charges so the government could gather additional evidence.  It also should be noted that, at the time of the enactment of Article 44, the Congressional Record reflects that the drafters were attempting to bring military practice in line with civilian practice.[8]

Twenty-eight years following the enactment of the UCMJ, the Supreme Court decided Crist v. Bretz, where it held, "Today we explicitly hold what Somerville assumed:  The federal rule that jeopardy attaches when the jury is empaneled and sworn is an integral part of the constitutional guarantee against double jeopardy."  437 U.S. 28, 38 (1978) (emphasis supplied).  The majority recognizes that the Fifth Amendment protection against double jeopardy applies in both the civilian and military contexts but relegates the point at which jeopardy attaches as a seemingly minor difference.  This ignores both the language of the Supreme Court's holding in Crist and the drafters' intent that the Double Jeopardy Clause apply in the military in the same manner as it did in civilian courts.  Of course, when Professor Morgan stated that intent to the Senate Committee, no one knew that the Fifth Amendment double jeopardy protections

---

[8] Professor Edmund Morris Morgan, chair of the drafting committee informed the Senate Committee that "I really am just as anxious as you Senators are to have the double jeopardy clause apply, and apply the way it does in civil courts."  Senate UCMJ Hearings, at 325.

attached when the jury is empaneled and sworn.  Once the decision in Crist was issued, state and local jurisdictions were required to bring their practices into conformance with the Constitution and in this circumstance there is no reason that the military should not do so as well.

The majority holds that application of the Fifth Amendment attachment of jeopardy to the military is inconsistent with other provisions in the UCMJ.  This implies that Article 44(c) was a provision that was carefully integrated and coordinated with the UCMJ provisions that the majority now claims will be inconsistent.  However, Article 44(c) was not part of the initial draft of the UCMJ and was drafted to address the Wade situation.[9]  In any event, Article 44(c) was clearly not adopted to address any issues of discipline or duty, but was adopted for the increased protection of servicemembers.  Any inconsistencies that may exist from application of the Crist rule to the military justice system are easily remedied by Congress or the President, and the fact that there may be inconsistencies does not implicate any overriding discipline or duty concern that would justify withholding Fifth Amendment protections from members of the military.

I would hold that jeopardy attaches in a general court-martial composed of members and presided over by a military

---

[9] See supra pp. 6-8.

judge upon swearing and empaneling the panel.[10]  Article 44(c) is

therefore unconstitutional as applied to Easton under the facts

of this case.

---

[10] Court member panels, like their civilian counterparts, take two oaths.  The first for the purposes of voir dire and the second to execute their duty as a panel.  Unlike civilian juries, however, court member panels swear to both oaths at the same time in one combined oath, prior to voir dire.  In contrast, civilian juries swear an oath for purposes of voir dire, then swear a second oath (and become empaneled) just prior to opening statements.  The military practice of a combined oath is merely for "administrative convenience."  See Manual for Courts-Martial, United States, Analysis of the Rules for Courts-Martial app. 21 at A21-49 (2008 ed.).  As this difference is simply for administrative convenience, it does not warrant a separate rule.